DANIEL G. BOGDEN
United States Attorney
District of Nevada
ROGER W. WENTHE
Assistant United States Attorney
Nevada Bar No. 8920
U.S. Attorney's Office
333 Las Vegas Boulevard South, Suite 5000
Las Vegas, Nevada 89101
Ph: 702-388-6336
Fax: 702-388-6787
Email: roger.wenthe@usdoj.gov

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General
MICHAEL D. GRANSTON
RENÉE BROOKER
JENELLE M. BEAVERS
KAVITHA J. BABU
Attorneys, Civil Division
United States Department of  Justice
Post Office Box 261, Ben Franklin Station
Washington, DC  20044
Tel:  (202) 305-3941
Fax:  (202) 307-5788
Email: jenelle.beavers@usdoj.gov
Email: kavitha.j.babu@usdoj.gov

Attorneys for the United States

///

///

///

///

1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>       v.<br><br>CREEKSIDE HOSPICE II, LLC, SKILLED HEALTHCARE GROUP INC. and SKILLED HEALTHCARE, LLC,<br><br>       Defendants.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No.: 2:13-cv-00167-APG-PAL |
| UNITED STATES OF AMERICA, *ex rel.* JOANNE CRETNEY-TSOSIE, *et al.*,<br><br>       Plaintiffs,<br><br>       v.<br><br>CREEKSIDE HOSPICE II, LLC, *et al.*,<br><br>       Defendants.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| UNITED STATES OF AMERICA, *ex rel.* VENETA LEPERA,<br><br>       Plaintiffs,<br><br>       v.<br><br>SKILLED HEALTHCARE, LLC, *et al.*,<br><br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## UNITED STATES'S AMENDED COMPLAINT IN INTERVENTION

By notice to the Court on August 6, 2014, the United States of America, by and through its undersigned counsel, partially intervened in *United States ex rel. Cretney-Tsosie v. Creekside Hospice II, LLC, et al.* (Case No. 2:13-cv-167-HDM) and *United States ex rel. Lepera v. Skilled Healthcare LLC, et al.* (Case No. 13-cv-1283-GMN-PAL). The United States further alleges as follows:

## I.   INTRODUCTION

1.  The United States (Plaintiff) bring this action against Creekside Hospice II, LLC ("Creekside"), its holding company Skilled Healthcare Group, Inc. ("SKG"), and Skilled Healthcare, LLC ("Skilled Healthcare"), which provides administrative services to Creekside, to recover losses sustained by the Medicare Program.  The majority of Creekside's funding is provided by the Medicare program.

2.  Creekside received $66.56 million in payments from the Medicare program from April 2010 through March 2013.

3.  Medicare is a federally-funded program that provides medical insurance for certain items and services to qualified people.  In addition to paying for doctor visits, nursing home care, and hospital stays, Medicare offers a hospice benefit for eligible Medicare beneficiaries.  Hospice care services include palliative care, or care to relieve the pain, symptoms, and stress for Medicare beneficiaries who are expected to die within six months.  Hospice care services are intended to include a comprehensive set of medical, social, psychological, emotional, and spiritual services.

4.  Hospice companies like Creekside are entitled to receive Medicare funds for hospice services provided to patients who are "terminally ill."  Electing the Medicare hospice benefit is a critical decision for an individual because he or she is electing to cease further curative care for his or her terminal illness.

5.  Hospices are paid a per diem rate by Medicare based on the number of days and level of care provided to the patient.  Medicare recognizes and provides reimbursement for four levels of hospice care:  routine home care, continuous home care, inpatient respite care, and general inpatient care.

6.  Medicare also reimburses hospices for certain physician services rendered in the

hospice setting, including services for the evaluation and management (E&M) of patients. Claims for these services are submitted using billing codes from the American Medical Association called Current Procedural Terminology Codes (CPT codes).   Where a physician has provided a more complete patient history, a more comprehensive examination, or has made a more complex medical decision, Medicare will reimburse the hospice at a higher level.

7. Creekside focused on maximizing Medicare reimbursement for as many patients as possible while disregarding patients' medical needs and regulatory requirements.

8. Creekside regularly ignored concerns expressed by its own physicians and nurses that its hospice patients were not terminally ill or in need of hospice care and thus, were not receiving appropriate care.

9. Creekside's business and marketing practices led to increased Medicare billings for hospice services, even when its patients did not need such medical services or were not eligible for certain medical services.  SKG and Skilled Healthcare's internal auditors and Creekside's employees brought these problems to light, yet the problems continued to persist.

10.     Specifically, since at least 2010, Creekside, SKG and Skilled Healthcare knowingly submitted or caused the submission of false claims to the Medicare programs by: (a) admitting certain patients who were not terminally ill and did not need hospice care, (b) billing inappropriately for certain physician evaluation and management services on behalf of Creekside's Medical Director, Dr. Upinder Singh, and (c) knowingly submitting or causing to be submitted fraudulent records and statements in support of their false claims for payment to the Medicare Programs.

11.     As a result of this conduct, Creekside, Skilled Healthcare, and SKG are liable under the False Claims Act, 31 U.S.C. § 3729, *et seq*. (the FCA) and federal common law.

## II.  JURISDICTION AND VENUE

12.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. § 3732(a) and (b), and has supplemental jurisdiction to entertain common law or equitable claims pursuant to 28 U.S.C. § 1367(a).

13.     This Court has personal jurisdiction over Skilled Healthcare, SKG, and Creekside under 31 U.S.C. § 3732(a) because they have adequate minimum contacts with the United States of America to make the assertion of personal jurisdiction over them reasonable.

14.     Venue is proper in this action in the District of Nevada under 28 U.S.C. §§ 1391 (b) – (c), and 31 U.S.C. § 3732(a), because Skilled Healthcare, SKG, and Creekside can be found in, reside in, and/or have transacted business within this Court's jurisdiction, and acts that they committed, in violation of the FCA occurred within this district.

## III.  THE PARTIES

15.     Plaintiffs in this action are the United States of America, suing on behalf of the United States Department of Health & Human Services ("HHS") and, specifically, its operating division, the Centers for Medicare & Medicaid Services ("CMS").

16.     At all times relevant to this Complaint, CMS was an operating division of HHS that administered and supervised the Medicare Program.

17.     Defendant Creekside's operations are based in Las Vegas, Nevada.  Creekside is a subsidiary of SKG.  At all times relevant to this Complaint, Creekside was engaged in the business of providing hospice care to individuals who were Medicare beneficiaries.

18.     On May 21, 2010, Home and Hospice Care Investments, LLC, a wholly owned subsidiary of SKG, purchased the assets of Creekside Hospice, Inc.  On information and belief, these assets were later contributed to defendant Creekside.

19.     Defendant SKG, a Delaware corporation, is headquartered in Foothill Ranch, California.  SKG is a holding company and owns several subsidiaries which provide health-care

services, including Skilled Healthcare and Creekside.

20.     Defendant Skilled Healthcare, a limited liability company, is a subsidiary of SKG and is headquartered in Foothill Ranch, California.  Skilled Healthcare provides administrative services to other subsidiaries of SKG including Creekside.

21.     SKG and Skilled Healthcare finance their hospice operations largely through receipt of Medicare dollars, and approximately 90 percent of Creekside's revenue is derived from the Medicare programs.

22.     Defendants Skilled Healthcare, SKG, and Creekside knowingly submitted or caused to be submitted false claims to the Medicare programs.

## IV.   THE FEDERAL FALSE CLAIMS ACT

23.     The FCA provides, in part, that any entity that (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; or (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim, is liable to the United States for damages and penalties.  31 U.S.C. §3729(a)(1)(A)-(B).

24.     To show that an entity acted "knowingly" under the FCA, the United States must prove that the entity, with respect to the information:  (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information.  The United States does not have to prove that the entity had the specific intent to defraud the United States.  31 U.S.C. §3729(b)(1).

## V.   THE MEDICARE HOSPICE PROGRAMS

### A.     Hospice Services Covered

25.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq*., establishes

the Health Insurance for the Aged and Disabled Program, commonly referred to as the Medicare Program (or "Medicare").

26.     The Medicare Program is comprised of four parts, Parts A, B, C, and D. Medicare Part A is a 100 percent federally-funded health insurance program for qualified individuals aged 65 and older, younger people with qualifying disabilities, and people with End Stage Renal Disease (permanent kidney failure requiring dialysis or transplant).  The majority of Medicare Part A's costs are paid by United States citizens through their payroll taxes.  The benefits covered by Medicare Part A include hospice care under 42 U.S.C. § 1395x(dd).

27.     Medicare outlines the admission criteria for hospice for various illnesses.

28.     Hospice is a program designed to provide patients with palliative care (i.e., care designed to relieve pain, symptoms or stress of terminal illness) instead of curative care (i.e., care designed to cure an illness or condition).  Hospice palliative care includes a comprehensive set of medical, social, psychological, emotional, and spiritual services for terminally ill individuals.  To be covered, hospice services must be reasonable and necessary for the palliation and management of a patient's terminal illness as well as related conditions.

29.     Hospice is available to terminally ill individuals for two initial 90-day periods, and then for an unlimited number of 60-day periods, as long as certain conditions are met, as described later.  *See* Medicare Benefit Policy Manual, Ch. 9, §§ 10, 20.1.

30.     In order to be eligible to elect hospice care under Medicare, an individual must be (a) entitled to Part A of Medicare; and (b) certified as terminally ill in accordance with 42 C.F.R. § 418.22.  *See* 42 U.S.C. § 1395f(7)(A); 42 C.F.R. § 418.20.  According to 42 C.F.R. § 418.3, "terminally ill" means that a person "has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course."  As discussed further below, there also must be specific medical information supporting the certification of terminal

7

illness.

31.     To receive the hospice benefit, Medicare beneficiaries must elect hospice care (i.e., it is *voluntary*) and in doing so, agree to forego curative treatment of their terminal illnesses.

32.     Patients who receive the Medicare hospice benefit no longer receive care that seeks to cure their terminal illnesses.  For this reason, electing hospice care is often a critical medical decision for a patient who has been informed that his or her death is imminent.

**B.     Obligations of the Hospice Provider**

33.     All Medicare providers must enroll in the respective programs as providers, and are expected to deal honestly with the Government and with patients.

34.     In addition, all healthcare providers, like Creekside and its related entities, are obligated to comply with applicable statutes, regulations, and guidelines in order to be reimbursed by Medicare.   When participating in Medicare, a provider has a duty to be knowledgeable of the statutes, regulations, and guidelines for coverage of services, and, in the case of hospice care, to know that Medicare only reimburses for services that are reasonable and necessary for the palliation or management of terminal illness.  42 U.S.C. § 1395y(a)(1)(C).

35.     Creekside, a Medicare provider that received over $42 million during the last two years in hospice revenue, the overwhelming majority of which was paid by Medicare, has a duty to have a thorough knowledge of the Medicare hospice program requirements, and to properly train and inform its employees regarding the requirements for Medicare coverage of hospice services.

36.     One of the purposes of the Medicare hospice requirements is to ensure that the limited funds available are properly spent on patients who are dying and need end of life care.

37.     To bill for hospice care, the hospice provider must ensure that a patient is

terminally ill before the individual is faced with the decision to stop receiving medical care that could cure his or her terminal illness.  The hospice provider must have a written certification of terminal illness that, among other things, includes:  (1) a statement that the individual's medical prognosis is that his or her life expectancy is six months or less if the terminal illness runs its normal course; (2) specific clinical findings and other documentation that support a determination that the patient has a life expectancy of six months or less; and (3) the signature(s) of the physician(s) attesting to these medical conclusions.  42 C.F.R. § 418.22.

38.     In addition to the Medicare regulations, these important requirements are also contained in the Medicare Benefit Policy Manual, Ch. 9, § 20.1, along with additional descriptions and guidance for hospice providers.

39.     Recognizing the gravity of a patient's decision to forgo curative care for a terminal illness, Medicare instructs that "[a] hospice needs to be certain that the physician's clinical judgment can be supported by clinical information and other documentation that provide a basis for the certification of six months or less if the illness runs its normal course.  A signed certification, absent a medically sound basis that supports the clinical judgment, is not sufficient for application of the hospice benefit under Medicare."  70 Fed. Reg. 70534-35.

40.     The clinical record for each hospice patient must contain "correct clinical information."  42 C.F.R. § 418.104.  All entries in the clinical record must be "legible, clear, complete, and appropriately authenticated and dated…" 42 C.F.R. § 418.104(b).

41.     Since January 1, 2011, a physician or nurse practitioner must have a face-to-face encounter with every hospice patient "to gather clinical findings to determine continued eligibility for hospice care" before recertifying a patient for more than 180 days of hospice services, and prior to each subsequent recertification.  42 C.F.R. § 418.22(a)(4). "The physician or nurse practitioner who performs the face-to-face encounter with the patient . . . must attest in

9

writing that he or she had a face-to-face encounter with the patient, including the date of that visit." 42 C.F.R. § 418.22(b)(4). "The attestation of the nurse practitioner or a non-certifying hospice physician shall state that the clinical findings of that visit were provided to the certifying physician for use in determining continued eligibility for hospice care." *Id*.

42.     For the initial 90-day period, the hospice provider must obtain a certification of terminal illness for the patient from both (a) the medical director of the hospice or a physician-member of the hospice interdisciplinary group, and (b) the individual's attending physician, if the individual has an attending physician.  For subsequent periods, the hospice provider must obtain the certification of terminal illness from either the medical director of the hospice or a physician who is a member of the hospice's interdisciplinary group for the patient. 42 U.S.C. § 1395f(a)(7)(A); 42 C.F.R. § 418.22.

43.     As specified by 42 C.F.R. § 418.56, the interdisciplinary group should consist of, at a minimum, a physician, a registered nurse, a social worker, and a pastor or other counselor.  The interdisciplinary group is responsible for coordination of each patient's care, to ensure continuous assessment of each patient's and family's needs, and the implementation of the interdisciplinary plan of care.

44.     Medicare also reimburses hospices for evaluation and management (E&M) services rendered by physicians in the hospice setting.  Claims for these services are submitted using billing codes from the American Medical Association called Current Procedural Terminology Codes (CPT codes).   E&M services are billed to Medicare using CPT codes 99334, 99335, 99336, and 99337 for established patients and 99324, 99325, 99326, 99327, and 99328 for new patients.

45.     Medicare pays the highest reimbursement for CPT codes 99336 and 99337 (Level 3 and Level 4 for established patients) and 99327 and 99328 (Level 4 and Level 5 for

new patients).  Billing at Levels 3, 4 and 5 codes requires that the physician has provided a

more complete patient history, a more comprehensive examination, and medical decision

involving a higher level of complexity, than the services provided at Levels 1or 2.

46.     The per diem rate for hospice services is deemed to include all administrative,

clinical and medical duties performed by the hospice's Medical Director, such as supervisory

duties, quality assurance duties, assessments of patients' eligibility for hospice, participation in

the establishment, review and updating of plans of care, supervising care and services and

establishing governing policies.  42 CFR § 418.304(a); Medicare Claims Processing Manual

(MCPM), Ch. 11, § 40.1.1.

47.     When the hospice's Medical Director, in this case Dr. Singh, provides a

service as the patient's attending physician that is not a service included within the hospice's

per diem payment, the hospice is permitted to charge Medicare Part A for that service using the

appropriate CPT Code.   The hospice receives 100% of the Medicare physician fee schedule

amount for that service, and it reimburses the physician according to whatever arrangement it

has with the physician.  42 CFR § 418.304(b); MCPM, Ch. 11, § 40.1.2.

48.     If the physician's services are for a condition unrelated to the patient's

terminal diagnosis condition, the physician must use modifier GW with the CPT Code.  MCPM,

Ch. 11, § 50.

### C.       The Medicare Hospice Payment Process

49.       The United States reimburses Medicare providers with payments from the Medicare Trust Fund, through CMS, as supported by American taxpayers.  CMS, in turn, contracts with Medicare Administrative Contractors ("Medicare claims processors," also known as "MACs"), to review, approve, and pay Medicare bills, called "claims," received from health care providers like Creekside.  In this capacity, the Medicare claims processors act on behalf of CMS.

50.       Payments are typically made by Medicare directly to health care providers like Creekside rather than to the patient.  The Medicare beneficiary usually assigns his or her right to Medicare payment to the provider.

51.       The Medicare provider either submits its bill directly to Medicare for payment, or it contracts with an independent billing company to submit a bill to the Medicare claims processor, on the provider's behalf.

52.       Since 2006, National Government Services (NGS) has been the MAC that is responsible for processing the claims that Creekside submitted to obtain Medicare payments for hospice services.

53.        NGS has provided guidance to hospice providers on the medical criteria for determining whether individuals with certain diagnoses have a prognosis of six months or less, and such guidance is publicly available.

54.       In addition, NGS has offered training and assistance to hospice providers on the Medicare requirements.

55.       Because it is not feasible for the Medicare program, or its contractors, to review the patient files for the millions of claims for payments it receives from hospice providers, the Medicare program relies upon the hospice providers to comply with the Medicare

requirements, and trusts the providers to submit truthful and accurate claims.  Hospice providers are reimbursed based upon their submission of a single electronic or hard-copy form called a "CMS-1450 form."

56.     All Medicare providers must have, in each of their patients' files, the medical documentation to establish that the Medicare items or services for which they have sought Medicare reimbursement are reasonable and medically necessary.

57. The payment rates are based on which level of care the hospice provider furnishes to a patient on a particular day.  42 C.F.R. § 418.302; Medicare Benefit Policy Manual, Ch. 9, § 40.

58.     The physician certifications and other documents that support the claim that hospice providers make to Medicare are submitted to Medicare only if the claim for hospice services is selected for medical review, which does not happen routinely.  *See generally* MCPM, Ch. 11, Processing Hospice Claims; Medicare Program Integrity Manual, Ch. 3, Verifying Potential Errors and Taking Corrective Actions.  Additionally, it is the hospice provider, like Creekside, and not the patient's primary care or treating physician, who is required to submit to Medicare the underlying documentation that supports the eligibility determination and the claim.

59.     Once the provider submits its CMS-1450 form to the MAC, the claims are paid directly to the provider.  On the CMS-1450 form, the hospice provider must state, among other things, the identity of the patient, the hospice's provider number, the patient's principal diagnosis, the date of the patient's certification or re-certification as "terminally ill," the location where hospice services were provided, and the level of hospice service provided.

60.     On the CMS-1450 form, the provider also certifies that the claim "is correct and complete," that "[p]hysician's certifications and re-certifications, if required by contract or

13

Federal regulations, are on file," and that "[r]ecords adequately disclosing services will be maintained and necessary information will be furnished to government agencies as required by applicable law."

61.     Federal law requires providers like Creekside that receive funds under the Medicare program, to report and return any overpayments within specified time periods.  42 U.S.C. § 1320a-7k(d).

VI.    **SKILLED HEALTHCARE, SKG, AND CREEKSIDE KNOWINGLY SUBMITTED OR CAUSED TO BE SUBMITTED FALSE AND FRAUDULENT CLAIMS FOR PATIENTS WHO WERE NOT TERMINALLY ILL AND DID NOT NEED HOSPICE CARE.**

62.     Skilled Healthcare, SKG, and Creekside knowingly submitted or caused to be submitted false or fraudulent claims to Medicare for patients who were not "terminally ill" with a prognosis of six months or less if their illness ran its normal course and, therefore did not need and were not eligible to receive end of life care.  Skilled Healthcare, SKG, and Creekside also knowingly created, submitted, or caused to be submitted documentation that falsely represented that certain patients were eligible for hospice when they were not.

A.  **Skilled Healthcare's, SKG's, and Creekside's Business Practices Led to the Submission of False or Fraudulent Claims for Ineligible Patients**

63.     Creekside's business practices led to the submission of false claims for patients who were not terminally ill and did not need end of life care and defendants knew or should have known that the patients did not need it.

i.      **Skilled Healthcare and SKG management encouraged Creekside employees to enroll patients in hospice even when they knew the patients did not need hospice care.**

64.     After SKG acquired Creekside in 2010, SKG and Creekside became intensely focused on increasing and maintaining the number of patients Creekside billed to Medicare.

65.     The Chief Executive Officer of SKG and several other managerial level

employees of SKG, Skilled Healthcare, and Creekside, routinely encouraged Creekside employees to enroll more patients in Creekside's hospice program, without regard to their eligibility or need for hospice care.

66.     As one example, in October 2010, SKG's CEO ordered the CEO and President of SKG's subsidiary, Home and Hospice Care Investments, LLC, as well as the Executive Vice President of Inpatient Operations of Skilled Healthcare, LLC, to increase Creekside's census by 18 patients within 7 days, so that SKG could report that its subsidiaries' total hospice census had reached 1,000 patients.  The Executive Vice President committed to obtain 9 patients and the President and CEO committed to "get the other 9."

67.     On October 13, 2012, SKG's Director of Quality and Compliance instructed Creekside employees how to document patient encounters, so that "we are all singing the same song," directing Creekside employees to correct past practices which had made the patients appear eligible for hospice when they were not eligible.  Specifically, the Director noted that Creekside employees had been failing to obtain certification at the start of care from both of the required physicians; that face-to-face encounters had not been performed in some cases; and that recertifications had not been signed in other cases.

68.     Also, in 2012, SKG's Director of Quality and Compliance was well aware, through audits and "mock surveys" of employees that she conducted, that Creekside had enrolled and recertified patients who were not terminally ill and, therefore, were not eligible for hospice.  The mock surveys gathered information from Creekside employees about record-keeping and revealed that Creekside employees created notations in medical records to make it appear that patients were eligible even though they were not.

69.     From at least late 2010, the SKG Quality Assurance and Program Improvement (QAPI) Department conducted reviews each quarter of its hospices' "quality

15

indicators," specifically including the length of stay for patients under its care.  The reviews routinely disclosed excessive lengths of stay beyond six months.  As a result of these audits, senior SKG employees were aware of the long lengths of stay at Creekside, particularly as compared to other SKG hospices, but Creekside did not take sufficient action to change its practices or address the problem of having long lengths of stays for patients.

70.     Two SKG employees, who were previously senior managers at Creekside prior to the acquisition of Creekside by SKG, were involved in all aspects of the operation of Creekside after the acquisition.  They also knew from internal audits and reviews that Creekside was admitting and retaining ineligible patients and that Creekside patients were remaining on service for long periods of time in excess of six months.

ii.     **Creekside used aggressive marketing techniques and paid employees bonuses to increase and maintain census numbers without regard to Medicare eligibility.**

71.     Creekside managers utilized aggressive marketing practices to increase Creekside's census without regard to whether a patient was eligible for hospice.

72.     Creekside's corporate culture encouraged its marketing and clinical staff to admit as many patients as possible, regardless of whether they were eligible for hospice. Creekside management selected "yes people" as admissions nurses to ensure that patients were admitted into hospice.   Creekside's Director of Operations pushed employees to admit patients he knew were not eligible for hospice, and he aggressively discouraged employees from permitting any patients or their families to revoke their election to accept hospice benefits, and from permitting patients to be discharged from hospice.

73.     Incentive bonuses were paid to Creekside employees for enrolling more patients, with the full knowledge and approval of Skilled Healthcare and SKG managers even though defendants knew ineligible patients were being admitted and retained.  For example, on

16

November 22, 2010, the Creekside Executive Director sought, and received, approval from Skilled Healthcare management to give Creekside employees a bonus of $1,500 because Creekside had "been busy and our census is really strong. :O)".

74.     Similarly, on July 1, 2011, a different Creekside employee emailed the Executive Director that she "had 29 admits last month, missed my goal by 1.  Yahoo!! Not bad right.? :)"  When the employee indicated that she would try to perform similarly the next month, the executive director responded, "I will bonus you 500 this pay day.  You really are my shining star and my friend."

75.     Creekside marketing employees were also authorized and encouraged to provide monetary and non-monetary incentives to referral sources, such as doctors, nurses, and other health-care professionals, in exchange for increased referrals of patients to Creekside.  In December 2011, a Creekside employee specifically asked one of the marketers "to do something" for the staff at a skilled nursing facility that referred patients to Creekside and specifically "take care of rehab, and west/north hall nurses' stations; along w/ admissions".

76.     Incentives provided to referral sources by Creekside marketers included cash, dinners, spa treatments, and donations of durable medical equipment.  Such incentives were provided without regard to whether patients were terminally ill and needed end of life care.

   iii.     **Creekside employees falsified documents to support patients' hospice eligibility.**

77.     Creekside, Skilled Healthcare, and SKG falsely certified on electronic claim forms that they submitted (or caused to be submitted) to Medicare that Creekside's claims were "correct and complete" and that Creekside maintained patient medical records in compliance with certification requirements.

78.     Creekside medical staff was pressured by Creekside marketing managers to admit or readmit patients who were inappropriate for hospice services.  Medical staff was

instructed to "beef up" records to support hospice eligibility.  Medical staff was encouraged to include language in the medical record indicating the patient's health was declining, even when staff knew the information was not accurate, which Creekside referred to as "Chart Savers."

79.     Creekside also discouraged medical staff members from including language in the medical record that the patient's health was improving whether or not that was an accurate description of the patient's condition; Creekside described using such language as "Chart Killers."

80.     As one example, on June 20, 2012, a Creekside nurse wrote to another nurse in an email:  "I'm a little concerned with the [chronic obstructive pulmonary disease diagnosis], but we can try.  I looked over your documentation and you have been very 'positive.'  And I know its [sic] because we thought he was coming off…but start focusing on his negatives please ;-)"

81.     According to Creekside employees, many patients who were on service for hospice were not terminal and were in fact healthy enough to perform many daily life activities, inconsistent with a terminally ill diagnosis.

82.     In another example, after being admitted on October 22, 2012, a Creekside patient revoked hospice after 8 days on service.  Prior to the hospice admission, the patient had appointments scheduled for an MRI and with a neurologist.  Her regular physician reportedly was "not pleased with hospice admission and suggested to husband that [patient] revoke so that they could continue aggressive tests/treatments."  And the patient improved during the 8 days she was admitted to hospice.  Subsequently, the patient revoked hospice on October 31, 2012, and planned instead to receive aggressive curative care.

83.     As shown in the specific patient examples below, *infra* Sec. VI.B., Creekside's own patient medical records showed that certain patients were not terminally ill and

did not need hospice care.

        **iv.**    **Defendants created false documents to record that physicians and nurses made in-person visits to patients when they had not.**

84.      Skilled Healthcare, SKG, and Creekside also created false documents to be placed in the medical records of patients to record that hospice physicians and nurses personally visited patients when they had not.

85.      Beginning on January 1, 2011, Medicare required hospices to complete face-to-face visits as a requirement for recertification for hospice benefits.  Creekside did not comply with the face-to face requirement when recertifying patients for end of life care.

86.      By April 1, 2011, CMS required hospices to have established and implemented internal processes to comply with the requirement to meet patients in person before recertifying them as terminally ill and in need of continued hospice care.  However, Skilled Healthcare, SKG and Creekside were not complying with this requirement.

87.      Instead of meeting patients in person before recertifying them for hospice care, as late as December 2011, management from Skilled Healthcare, SKG, and Creekside instructed employees to "adjust" the medical records to indicate that face-to-face encounters had actually occurred, when in fact they had not occurred, to ensure reimbursement from Medicare.

88.      In December 2011, Creekside employees created false documentation of face-to-face encounters to record falsely that patients had been visited in person.  Creekside employees back-dated the documents to make it appear that visits occurred when they had not and then inserted the falsified documents into patients' medical records.

**B. Examples of False Claims for Ineligible Patients Who Were Not Terminally Ill and Did Not Need Hospice Care[1]**

89.      Skilled Healthcare, SKG, and Creekside knowingly submitted or caused to be

---

[1] To protect patient privacy, the United States has not identified by name the individuals who are used as examples of patients in this Complaint.  The United States will serve Creekside with a list identifying each patient by name and patient identification number.

submitted to Medicare numerous false or fraudulent claims for Medicare reimbursement for patients who were not terminally ill and did not need hospice care, as shown by some examples below.

### i.   Patient NT

90.     Skilled Healthcare, SKG, and Creekside knowingly submitted or caused to be submitted false or fraudulent claims to Medicare for hospice care for Patient NT from April 14, 2010 through March 31, 2013.  These claims were false or fraudulent because Creekside's medical records for NT show that NT was not terminally ill and did not need hospice care.

91.     In October 2009, NT had surgery, with curative intent to remove cancer in his lung, and underwent chemotherapy.  Post-surgery scans and documentation showed NT to be stable.

92.     NT's lung cancer was not end stage.  In order to be eligible to undergo surgery to remove a portion of his lung, NT's disease would not have been metastatic and NT would have had good pulmonary reserve.

93.     In April 2010, Creekside admitted NT to hospice with a diagnosis of lung cancer.

94.     On April 14, 2010, Creekside justified continued hospice care on the basis that NT was hypoxic, meaning he did not have of an adequate oxygen supply.  However, NT's medical records during the same period show that his oxygen saturation (the level of oxygen in his blood) from only room air was 94 percent, which is inconsistent with hypoxia. A normal oxygen saturation is above 92.

95.     On July 1, 2010, Creekside further justified continued hospice care on the basis that NT was suffering from disabling shortness of breath while at rest.  However, NT's medical records indicate that he performed activities of daily living, lived alone in his own

home while all of his family lived out of state , and that he declined the assistance of an aide.

96.     In September 2010, Creekside further justified continued hospice care on the basis that NT increasingly needed oxygen support.  However, NT's medical record, during the same period, indicates that his air saturation was 98 percent, demonstrating that he did not need oxygen support.

97.     In December 2010, at the time of recertifying NT for continued hospice care, Creekside justified the need for further end of life care on the basis that NT had prostate cancer. While NT had prostrate cancer previously, his contemporaneous medical records do not show active prostate disease.  Yet, Creekside continued to justify NT's continued need for hospice care based on a diagnosis of prostate cancer into September 2011.

98.     On March 20, 2011, Creekside justified recertifying NT for hospice care by using a diagnosis of metastatic lung cancer.  However, NT's medical records do not include any scans documenting the spread of NT's lung cancer and, in fact, there is no evidence in the medical records that NT ever had metastatic disease and NT's physician pointed this out, as recorded in the medical record.

99.     In August 2011, Creekside justified NT's continued need for hospice care based on weight loss.  However, NT's medical records indicate that his weight remained stable.

100.    In May 2012, after billing Medicare 24 months for hospice services for NT, Creekside changed the justification for NT's need for hospice care to chronic obstructive pulmonary disease ("COPD").

101.    In January 2013, the medical records showed that NT's oxygen saturation with only room air was 95 percent oxygen capacity which is inconsistent with hypoxia and his end stage COPD diagnosis.

102.    While Creekside justified billing Medicare for hospice stating that NT could

not walk more than 10 feet, in a face-to face visit with a physician in January 2013, the physician notes that NT walks 100 feet to an exercise class 2-3 times a week and goes to the store to purchase food independently and without the use of additional oxygen.  These activities would be impossible with end stage COPD, in which the patient experiences shortness of breath even at rest.

103.    If NT had suffered from metastatic lung cancer as Creekside claimed, his life expectancy would have been 6-9 months.  However, when Creekside discharged NT in March 2013, NT had been on hospice service for approximately 3 years.

104.    Skilled Healthcare, SKG, and Creekside knowingly submitted or caused the submission of false or fraudulent claims to Medicare for hospice care on behalf of patient NT, for more than 1083 days, from April 14, 2010 through March 31, 2013, in the amount of $162,843.82 and Medicare paid those claims.

**ii.  Patient JF**

105.    Skilled Healthcare, SKG, and Creekside knowingly submitted or caused to be submitted false or fraudulent claims to Medicare for hospice care for Patient JF from February 21, 2010 through December 1, 2012.  These claims were false or fraudulent because Creekside's medical records for JF show that JF was not terminally ill and did not need hospice care.

106.    Creekside admitted JF to hospice on February 21, 2010, with a diagnosis of debility unspecified, but JF did not meet the medical criteria for this condition.

107.    At the time of his admission, Creekside documented that JF had an infection but that the condition was not life threatening.  Creekside also documented that, although JF had lost some weight, he had gained the weight back.

108.    In May 2011, Creekside changed JF's primary diagnosis to dementia, noted

his prior history of colon cancer, and recertified JF for hospice.  JF was not on any dementia medication which is the standard of care and therefore inconsistent with his diagnosis.

109.     JF did not meet the medical criteria for dementia, and JF's medical records do not indicate that JF's colon cancer recurred or that JF was ever suffering from end-stage colon cancer.

110.     The medical records further show that, in July 2011, Creekside described JF as "relatively lucid and asked for assistance to amend his will," that the "delusions and fantasies that have troubled [JF] in the past may now be controlled," and that JF "has been consistently lucid and clear on my recent visits."

111.     One month later, on August 5, 2011, Creekside documented JF's decline, and indicated that JF had gone from being non-communicative to not being able to hold himself upright without assistance in an extremely short period of time despite the fact that a month before he was lucid enough to request assistance to amend his will.

112.     The decline from consistently lucid and clear to not being able to hold himself upright a month later is inconsistent with dementia.  While Creekside noted a rapid decline, JF's medical records do not include any clinical support for a rapid decline.

113.     In February 2012, Creekside again recertified JF for hospice on the basis of the same diagnoses, as well as noting JF had Parkinson's disease and experienced cardiac arrest. There is no support in JF's medical records to show that JF had any symptoms of Parkinson's disease or that he had experienced cardiac arrest.

114.     During 2012, JF was described in Creekside's documents as "still responsive, but much less verbal" on one visit, "awake and alert" on another visit, and "alert but confused" on a third visit.  JF continued to have a good appetite throughout 2012, as he had in previous years.  These notes are inconsistent with the level of decline noted on August 5, 2011.  If JF

could not hold himself up in 2011 due to end stage dementia as Creekside contended, then JF would not be alert in 2012.

115.    Creekside again recertified JF for hospice on November 19, 2012, noting decline.  However, two weeks later, Creekside discharged JF from hospice on December 1, 2012, due to an extended prognosis.

116.    Skilled Healthcare, SKG, and Creekside knowingly submitted or caused the submission of false or fraudulent claims to Medicare for hospice care on behalf of patient JF, for at least 1,014 days, from February 21, 2010 through December 1, 2012, in the amount of $148,835.99; and Medicare paid the claims.

**iii.  Patient DP**

117.    Skilled Healthcare, SKG, and Creekside knowingly submitted or caused to be submitted false or fraudulent claims to Medicare for hospice care for Patient DP from May 23, 2010 through November 13, 2011.  These claims were false or fraudulent because DP was not terminally ill and did not need hospice care.

118.    Creekside admitted DP to hospice with a COPD diagnosis in May 2010, and changed DP's diagnosis to cardiac disease in October 2010.

119.    DP's medical records do not support a diagnosis of COPD or cardiac disease for DP.  While DP had an oxygen tank, DP did not use the tank because she/he did not experience shortness of breath, upon exertion or at rest.  DP did not have other symptoms to warrant an end stage cardiac disease diagnosis.

120.    Creekside made a notation in DP's records of her rapid decline to further justify DP's eligibility for hospice.  However, DP was performing daily living activities, such as living in her own home, taking a road trip, and selling her home and moving to another home.

121.    To further justify DP's need for hospice care at the time of recertification,

Creekside noted in DP's medical record that DP had frequent hospitalizations during her hospice stay.  However, there is no documentation in the medical records of DP's admission to a hospital or emergency room after her admission to Creekside.

122.     From August 2011 through November 2011, immediately before discharging DP, Creekside made notations in DP's medical records that DP experienced increases in shortness of breath, chest pain, vertigo, and weakness, but discharged DP on November 13, 2011.  Creekside's discharge note for DP concludes that DP was stable and had no recent decline in health.

123.     Skilled Healthcare, SKG, and Creekside knowingly submitted or caused the submission of false or fraudulent claims to Medicare for hospice care on behalf of patient DP, for at least 539 days, from May 23, 2010 through November 13, 2011, in the amount of $91,943.41; and Medicare paid the claims.

### iv.  Patient LR

124.     Skilled Healthcare, SKG, and Creekside knowingly submitted or caused to be submitted false or fraudulent claims to Medicare for hospice care for Patient LR from August 28, 2009 through February 4, 2013.  These claims were false or fraudulent because Creekside's medical records for LR show that LR was not terminally ill and did not need hospice care.

125.     Creekside admitted LR with a diagnosis of COPD on August 28, 2009.

126.     At the time of admission to hospice, LR lived independently in an apartment associated with a group home, and was able to walk stairs with only standby assistance and use the bathroom independently.

127.     Immediately prior to admission to hospice, LR received post-surgery care at a long term acute care facility.  The admission to the long term acute care facility indicates that LR had an acute illness that could be rehabilitated.

128.     LR's ability to live independently, walk stairs with limited assistance and use the bathroom independently contradicts Creekside's diagnosis that LR suffered from end-stage COPD.

129.     At the time of the first recertification on November 25, 2009, Creekside continued to submit claims to Medicare for LR for hospice care, based upon the COPD diagnosis.

130.     Creekside further justified LR's recertification to hospice by stating on August 19, 2010, that LR was admitted to the emergency room on more than one occasion, that she needed assistance with various activities of daily living, and that she could not walk for more than 5 feet without caregiver assistance.

131.     There was no evidence in the medical record that LR was ever admitted to the emergency room and LR's medical records also noted that she performed many activities of daily living including dressing independently and walking with the use of a walker.

132.     On February 2, 2012 Creekside added dementia and "confusion" as additional justifications on February 2, 2012. There is no indication in the medical records that any physician diagnosed LR with dementia

133.     In September 2012, Creekside documented LR as being hypoxic.  During this same time period, LR's nurses noted that LR was going shopping without the need for supplemental oxygen.

134.     In November 2012, the Creekside Chaplain noted that there was "no visible change" in LR's general health suggesting her health was not declining.

135.     On January 18, 2013, Creekside recorded that LR's prognosis was declining. However, on February 4, 2013, Creekside discharged LR for extended prognosis.

136.     Skilled Healthcare, SKG, and Creekside knowingly submitted or caused the

submission of false or fraudulent claims to Medicare for hospice care on behalf of patient LR, for at least 1,256 days, from August 28, 2009 through February 4, 2013, in the amount of $148,835.99; and Medicare paid the claims.

### v.  Patient FJ

137.     Skilled Healthcare, SKG, and Creekside knowingly submitted or caused to be submitted false or fraudulent claims to Medicare for hospice care for Patient FJ from October 30, 2010 through November 12, 2012.  These claims were false or fraudulent because Creekside's medical records for FJ show that FJ was not terminally ill and did not need hospice care.

138.     In October 2010, Creekside admitted FJ to hospice based upon a diagnosis of Alzheimer's disease, and noted that the disease was in its final stage.

139.     However, notations in the medical records one month later indicate that FJ could identify people correctly and where he was living, and could communicate verbally. These actions are inconsistent with Creekside's diagnosis of end stage Alzheimer's.

140.     In October 2010, Creekside also justified FJ's hospice care on the basis that FJ had lost weight.  However, the medical record shows that FJ generally gained or maintained his weight, continuing through the remainder of his stay on hospice.

141.     Throughout his hospice stay, Creekside repeatedly documented a decline in FJ's mental capacity, yet at the time Creekside discharged FJ from hospice in November 2012, FJ was eating, communicating verbally, and mobile.  This is inconsistent with a diagnosis of end stage Alzheimer's disease.

142.     Skilled Healthcare, SKG, and Creekside knowingly submitted or caused the submission of false or fraudulent claims to Medicare for hospice care on behalf of patient FJ, for at least 744 days, from October 30, 2010 through November 12, 2012, in the amount of

$130,882.99 to Medicare; and Medicare paid the claims.

**VII.    SKILLED HEALTHCARE, SKG, AND CREEKSIDE KNOWINGLY SUBMITTED OR CAUSED TO BE SUBMITTED FALSE AND FRAUDULENT CLAIMS BY OVERBILLING MEDICARE FOR HOSPICE-RELATED SERVICES ON BEHALF OF ITS MEDICAL DIRECTOR.**

143.    Skilled Healthcare, SKG, and Creekside, knowingly submitted or caused to be submitted false or fraudulent claims to Medicare for services allegedly performed by Creekside's Medical Director, Dr. Upinder Singh, by using billing codes that resulted in higher Medicare reimbursement than would have been justified by the services actually performed by the Medical Director.  In short, Creekside both double-billed Medicare for Dr. Singh's services (because the services were paid for as part of the hospice per diem), and charged Medicare a higher rate for services than was reasonable or necessary.

144.    As described above, Medicare reimburses hospices for certain services rendered by physicians in the hospice setting, including services for the evaluation and management (E&M) of patients.  Claims for these services are submitted using billing codes from the American Medical Association called Current Procedural Terminology Codes (CPT codes).   Where a physician has provided a more complete patient history, a more comprehensive examination, or made a more complex medical decision, Medicare will reimburse the hospice at a higher level.

145.    Defendants repeatedly submitted claims for services allegedly performed by Dr. Singh by using the highest and second highest billing codes for E&M services, even when Dr. Singh did not provide the services.  For established patients, Defendants used CPT code 99336/99337.  For new patients, Defendants used CPT code 99327/99328.

146.    If the physician's services are for a condition unrelated to the patient's terminal diagnosis condition, the physician must use modifier GW with the CPT Code.  Creekside did not use a GW modifier to indicate that the separate services were for a condition

unrelated to patients' terminal conditions.

147.     For certain patients, Creekside further double-billed for Dr. Singh's services as Medical Director that were reimbursed at the per diem rate.

### vi.  Patient BC

148.     Skilled Healthcare, SKG, and Creekside billed Medicare for patient BC on August 10, 2010, using CPT code 99337, claiming that Dr. Singh provided a highly complex E&M evaluation of BC.  However, the medical records generated by Dr. Singh for this visit show that the services Dr. Singh provided were actually those described by CPT code 99335, a less-complex E&M visit, reimbursable by Medicare at a lower rate.

149.     Skilled Healthcare, SKG, and Creekside knowingly submitted or caused the submission of a false or fraudulent claim to Medicare for services on behalf of BC on August 10, 2010, in the amount of $185.00; and Medicare paid the claim.

150.     Skilled Healthcare, SKG, and Creekside also improperly submitted or caused to be submitted separate claims for Dr. Singh's E&M services for BC that he performed as Medical Director, and for which Creekside was also reimbursed by Medicare as part of the per diem rate.

151.     Skilled Healthcare, SKG, and Creekside double-billed Medicare for patient BC on August 30, 2011, using CPT code 99336, claiming that Dr. Singh provided a highly complex E&M evaluation of BC.

152.     Skilled Healthcare, SKG, and Creekside knowingly submitted or caused the submission of a false or fraudulent claim to Medicare for services on behalf of TA on August 30, 2011, in the amount of $129.76; and Medicare paid the claim.

153.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### vii. Patient FF

154.    Skilled Healthcare, SKG, and Creekside billed Medicare for patient FF on April 18, 2011, using CPT code 99327, claiming that Dr. Singh provided a highly complex E&M evaluation of FF.  However, the medical records generated by Dr. Singh for this visit show that the services Dr. Singh provided were actually those described by CPT code 99325, a less-complex E&M visit, reimbursable by Medicare at a lower rate.

155.    Skilled Healthcare, SKG, and Creekside knowingly submitted or caused the submission of a false or fraudulent claim to Medicare for services on behalf of FF on April 18, 2011, in the amount of $180.00; and Medicare paid the claim.

### viii.    Patient MM

156.    Skilled Healthcare, SKG, and Creekside billed Medicare for patient MM on April 5, 2011, using CPT code 99327, claiming that Dr. Singh provided a highly complex E&M evaluation of MM.  However, the medical records generated by Dr. Singh for this visit show that the services Dr. Singh provided were actually those described by CPT code 99325, a less-complex E&M visit, reimbursable by Medicare at a lower rate.

157.    Skilled Healthcare, SKG, and Creekside knowingly submitted or caused the submission of a false or fraudulent claim to Medicare for services on behalf of MM on April 5, 2011, in the amount of $180.67; and Medicare paid the claim.

158.    Skilled Healthcare, SKG, and Creekside also improperly submitted or caused to be submitted separate claims for Dr. Singh's E&M services for MM that he performed as Medical Director, and for which Creekside was also reimbursed by Medicare as part of the per diem rate.

### ix.  Patient TA

159.     Skilled Healthcare, SKG, and Creekside double-billed Medicare for patient

TA on June 7, 2011, using CPT code 99336, claiming that Dr. Singh provided a highly complex E&M evaluation of a new patient.

160.    Skilled Healthcare, SKG, and Creekside improperly submitted or caused to be submitted separate claims for Dr. Singh's E&M services for TA that he performed as Medical Director, and for which Creekside was also reimbursed by Medicare as part of the per diem rate.

161.    Skilled Healthcare, SKG, and Creekside knowingly submitted or caused the submission of a false or fraudulent claim to Medicare for services on behalf of TA on June 7, 2011, in the amount of $129.76; and Medicare paid the claim.

### x.  Patient IG

162.    Skilled Healthcare, SKG, and Creekside double-billed Medicare for patient IG on July 25, 2011, using CPT code 99336, claiming Dr. Singh provided a highly complex E&M evaluation of IG.

163.    Skilled Healthcare, SKG, and Creekside improperly submitted or caused to be submitted separate claims for Dr. Singh's E&M services for IG that he performed as Medical Director, and for which Creekside was also reimbursed by Medicare as part of the per diem rate.

164.    Skilled Healthcare, SKG, and Creekside knowingly submitted or caused the submission of a false or fraudulent claim to Medicare on behalf of patient IG on July 25, 2011, in the amount of $129.76; and Medicare paid the claim.

### FIRST CAUSE OF ACTION
### (False or Fraudulent Claims)
### (False Claims Act-31 U.S.C. § 3729(a)(1)(A))

165.    The United States re-alleges and incorporates by reference the allegations of paragraphs 1 through 179.

166.    By virtue of the acts described above, Skilled Healthcare, SKG, and Creekside knowingly presented or caused to be presented to an officer or employee of the United States

31

false or fraudulent Medicare claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A); that is, Skilled Healthcare, SKG, and Creekside knowingly made or presented, or caused to be made or presented, to the United States claims for payment for hospice services for patients who were not eligible in whole or part for Medicare hospice benefits because they were not terminally ill, and for medically unnecessary services or services that were not provided or were inappropriate.

167.    By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial; and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and not more than $11,000 per false claim.  Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

**SECOND CAUSE OF ACTION**
**(False Statements)**
**(False Claims Act-31 U.S.C. § 3729(a)(1)(B))**

168.    The United States re-alleges and incorporates by reference the allegations of paragraphs 1 through 179.

169.    By virtue of the acts described above, Skilled Healthcare, SKG, and Creekside knowingly made, used, or caused to be used a false record or statement material to a false or fraudulent Medicare claim, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

170.    By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial; and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and not more than $11,000 per false claim.  Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by

the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg.

47099, 47103 (1999), the civil penalties were adjusted to $5,500 to $11,000 for violations

occurring on or after September 29, 1999.

**THIRD CAUSE OF ACTION**
**(Payment by Mistake)**

171.     The United States re-alleges and incorporates by reference the allegations of

paragraphs 1 through 179.

172.     This is a claim by the United States for the recovery of monies paid to Skilled

Healthcare, SKG, and Creekside by mistake for ineligible Medicare beneficiaries who were not

terminally ill, and for Medicare services that were medically unnecessary, or not appropriate.

173.     As a consequence of the conduct and the acts set forth above, Skilled

Healthcare, SKG, and Creekside were paid by mistake by the United States in an amount to be

determined which, under the circumstances, in equity and good conscience, should be returned

to the United States.

**FOURTH CAUSE OF ACTION**
**(Unjust Enrichment)**

174.     The United States re-alleges and incorporates by reference the allegations of

paragraphs 1 through 179.

175.     This is a claim by the United States for recovery of monies by which Skilled

Healthcare, SKG, and Creekside have been unjustly enriched.

176.     By virtue of the conduct and the acts described above, Skilled Healthcare,

SKG, and Creekside were unjustly enriched at the expense of the United States in an amount to

be determined, which, under the circumstances, in equity and good conscience, should be

returned to the United States.

**PRAYER FOR RELIEF AND JURY DEMAND**

WHEREFORE, the United States respectfully pray for judgment in their favor as follows:

a.     As to First and Second Causes of Action (False Claims Act), against Skilled Healthcare, SKG, and Creekside for: (i) statutory damages in an amount to be established at trial, trebled as required by law, and such penalties as are required by law; (ii) the costs of this action, plus interest, as provided by law; and (iii) any other relief that this Court deems appropriate, to be determined at a trial by jury.

b.     As to the Third Cause of Action (Payment Under Mistake of Fact), for:  (i) an amount equal to the money paid by the United States through the Medicare Program to Skilled Healthcare, SKG, or Creekside, and illegally retained by Skilled Healthcare, SKG, or Creekside, plus interest; (ii) the costs of this action, plus interest, as provided by law; and (iii) any other relief that this Court deems appropriate, to be determined at a trial by jury.

c.     As to the Fourth Cause of Action (Unjust Enrichment), for:  (i) an amount equal to the money paid by the United States through the Medicare Program to Skilled Healthcare, SKG, and Creekside, or the amount by which Skilled Healthcare, SKG, and Creekside were unjustly enriched, plus interest; (ii) the costs of this action, plus interest, as provided by law; and (iii) any other relief that this Court deems appropriate, to be determined at a trial by jury.

d.     And for all other and further relief as the Court may deem just and proper.

The United States hereby demand a jury trial on all claims alleged herein.

Dated:  August 3, 2015

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

DANIEL G. BOGDEN
United States Attorney

_____*/s/ Roger Wenthe*_____
ROGER WENTHE
Assistant United States Attorney

MICHAEL D. GRANSTON
RENÉE BROOKER
JENELLE M. BEAVERS
KAVITHA J. BABU
Attorneys, Civil Division

**CERTIFICATE OF SERVICE**

I hereby certify that on this 3rd day of August 2015, a true and correct copy of the foregoing document was filed with the Court using the Court's CM/ECF system and was served upon each attorney of record via ECF notification.


___/s/ Kavitha J. Babu_____
Kavitha J. Babu

36