**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CREEKSIDE HOSPICE II, LLC, SKILLED | ) |
| HEALTHCARE GROUP INC. and SKILLED | ) |
| HEALTHCARE, LLC, | ) |
| | ) |
| Defendants. | )   Case No.: 2:13-cv-00167-APG-PAL |
| | ) |
| UNITED STATES OF AMERICA, *ex rel.* | ) |
| JOANNE CRETNEY-TSOSIE, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| CREEKSIDE HOSPICE II, LLC, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| UNITED STATES OF AMERICA, *ex rel.* | ) |
| VENETA LEPERA, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| SKILLED HEALTHCARE, LLC, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**JOINT MOTION TO RESEAL DOCUMENTS 102 AND 136 AND
TO SUBSTITUTE DOCUMENTS 1 AND 4**

Counsel for the respective Parties request that the Court reseal documents 102 and 136 in this

matter, and to substitute redacted versions of Relator Joanne Cretney-Tsosie's Complaint (Dkt. #1)

DB1/ 86052539.1

and Amended Complaint (Dkt. #4) in order to prevent dissemination of the personally identifiable information in those documents.

## A.     Background

These consolidated civil False Claims Act (FCA) cases both began as a *qui tam* lawsuits filed under seal, as required by the FCA.  On August 6, 2014, the United States filed a notice that it was intervening in these cases (#34).  Prior to that notice, all filings were made under seal as the FCA requires.

On September 17, 2015, Defendants filed a motion to unseal those filings in both cases which had been made under seal prior to the United States' intervention in this matter.  (Cretney-Tsosie Case #117.)  On December 30, 2015, the Court entered an order in each of the cases stating: "The clerk of court shall unseal sealed documents in both consolidated actions (Case no. 2:13-cv-01283 and 2:13-cv-0167)."  (Cretney-Tsosie Case #147; Lepera Case # 27.)

This order, however, was apparently interpreted by the Clerk of Court as requiring the unsealing of all documents in the two cases which were under seal, including those filed after the United States had intervened.  Counsel has confirmed, by checking the docket, that two such sealed documents in this matter, ## 102 and 136, have been unsealed, even though Defendants did not intend for them to be unsealed.

The two documents at issue contain lists of the names and dates of service for patients in the statistically valid random sample as to whom the United States contends false claims were submitted by Defendants.  Under the protective order entered in this action, documents produced in this action that contain identifiable patient health information (PHI) are to be marked confidential and if these documents are filed with the court the document is to be de-identified or filed under seal. DKT 141. These documents referenced as #102 and #136 were submitted under seal in accordance with the protective order and Local Rule 10-5 and in compliance with the litigation proceedings requirements

contained in the Health Insurance Portability and Accountability Act (HIPAA) governing regulations. *See* 45 CFR § 164.512(e)(1)(ii)(B).

The parties do not intend that identifiable patient information be disclosed in this action including the documents filed under seal referenced in DKT #102 and #136.

In addition, in Relator Cretney-Tsosie's Complaint (Dkt. #1) and Amended Complaint (Dkt. #4), Relator identified several Creekside patients by their first names and the first initial of their last names. As a result, in Relator's Response to Defendants' Motion to Unseal Related Actions (Dkt. #120), Relator asked that in the event the Court granted Defendants' motion, that the Court order the names of the Creekside patients be redacted before the complaints became publicly accessible.  In this Court's Order granting Defendants' Motion to Unseal Related Actions (Dkt. #147), the Court stated that "a review of the pleadings reflects [that Relator] merely provided two letter initials for a handful of sample patients used to illustrate the nature of the alleged fraud."  12/30/15 Order at 13-14.  However, because Relator's Complaint and Amended Complaint contain complete first names of patients rather than first initials, Relator asks this Court to substitute the attached redacted Complaint and Amended Complaint (attached as Exhibits A and B).  The only change in the revised Complaint and Amended Complaint is the redaction of the complete first names of the patients, leaving only the patients' initials.  All parties agree with this substitution.

///

///

///

///

///

///

///

**B.     Conclusion**

In order to protect the personally identifiable information in these four documents, the Parties jointly request the Court to re-seal Documents 102 and 136 in this matter and to substitute Documents 1 and 4 with Exhibits A and B.

Dated:  January 6, 2016

For the Plaintiff:
BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General
DANIEL G. BOGDEN
United States Attorney


   */s/ Roger Wenthe*
ROGER WENTHE
Assistant United States Attorney

MICHAEL D. GRANSTON
RENÉE BROOKER
JENELLE M. BEAVERS
KAVITHA J. BABU
Attorneys, Civil Division

For the Relators:

L. Timothy Terry (NV Bar #2341)
tim@theterrylawfirm.com
The Terry Law Firm, Ltd.
P.O. Box 2348
Carson City, NV 89702
775.883.2348

Steven Cohen (admitted pro hac vice)
scohen@cohenlawgroup.com
Cohen Law Group
70 West Madison Street, Suite 4000
Chicago IL 60602
312.327.8800

Matthew J. Piers (admitted pro hac vice)
mpiers@hsplegal.com
Joshua Karsh (admitted pro hac vice)
jkarsh@hsplegal.com
Juliet Berger-White (admitted pro hac vice)
jberger-white@hsplegal.com
Caryn Lederer
clederer@hsplegal.com
Hughes Socol Piers Resnick & Dym, Ltd.
Three First National Plaza
70 West Madison Street, Suite 4000

DB1/ 86052539.1

Chicago, Illinois 60602
312.580.0100
By: /s/ _____
Attorneys for Plaintiff/Relator Joanne
Cretney-Tsosie

Ruth L. Cohen, Esq. (NV Bar No: 1782)
Email: rcohen@caplawyers.com
Paul S. Padda, Esq. (NV Bar No. 10417)
Email: ppadda@caplawyers.com
COHEN & PADDA, LLP
4240 West Flamingo Road, Suite 220
Las Vegas, Nevada 89103
Tele: (702) 366-1888
Fax: (702) 366-1940
By: /s/ _____
Attorneys for Relator Veneta Lepera

For the Defendants:

Kathleen McDermott (admitted pro hac vice)
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Ave NW
Washington, DC 20004
Email: kmcdermott@morganlewis.com
Tel.: (202) 739-5458
Charles H. McCrea (NV Bar No. 104)
Hejmanowski & McCrea LLC
520 S. 4th Street, Suite 320
Las Vegas, Nevada 89101
Email: chm@hmlawlv.com
Tel.: (702) 834-8777
By: /s/ Kathleen McDermott _____
Attorneys for Defendants

IT IS ORDERED that Dkt. ##102 and 136 shall be sealed and Plaintiff shall file redacted versions of Dkt. ##1 and 4 to prevent dissemination of personally identifying information.

IT IS FURTHER ORDERED that no further stipulations or joint requests will be approved that fail to comply with LR 6-2(a).

DATED this 8th day of January, 2016.

Peggy A. Leen
United States Magistrate Judge

## CERTIFICATE OF SERVICE

I hereby certify that on the date shown, a true and correct copy of the foregoing document was filed with the Court using the Court's CM/ECF system and was served upon each attorney of record via ECF notification.

Dated:  January 6, 2016

_/s/ Roger W. Wenthe_
Roger W. Wenthe

# EXHIBIT A

L. Timothy Terry (NV Bar #2341)
tim@theterrylawfirm.com
The Terry Law Firm, Ltd.
P. O. Box 2348
Carson City, NV 89702
775.883.2348 (Ph)
775.883.2347 (Fax)

Attorney for Plaintiff/Relator
    Joanne Cretney-Tsosie

4/9/12 lj

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>*ex rel.* JOANNE CRETNEY-TSOSIE; )<br>and STATE OF NEVADA *ex rel.* )<br>JOANNE CRETNEY-TSOSIE; and )<br>JOANNE CRETNEY-TSOSIE, )<br>individually, )<br> )<br>            Plaintiffs, )<br> )<br>vs. )<br> )<br>CREEKSIDE HOSPICE II, LLC, and )<br>SKILLED HEALTHCARE GROUP, )<br>INC., )<br> )<br>            Defendants. )<br> )<br> )<br>————————————————— ) | CV. No. ___3-12-cv-190-HDM-WGG___<br><br>**FILED IN CAMERA AND UNDER SEAL**<br><br>**DO NOT ENTER INCM/ECF**<br><br>COMPLAINT FOR VIOLATION OF THE<br>UNITED STATES FALSE CLAIMS ACT,<br>31 U.S.C. § 3729, *et seq*; and the NEVADA<br>FALSE CLAIMS ACT, NRS 357.010 *et seq*<br><br>**JURY TRIAL DEMANDED** |

## I.   JURISDICTION AND VENUE

1.     Plaintiff/Relator Joanne Cretney-Tsosie ("Tsosie") brings this action on behalf of the United States of America under the federal False Claims Act, 31 U.S.C. § 3729 *et seq*, on behalf of the State of Nevada under the Nevada False Claims Act, NRS 357.010 *et seq*, and on her own behalf, against Creekside Hospice II, LLC ("Creekside") and Skilled Healthcare Group, Inc. ("SKH").

2.     This action involves Defendants' submission of false claims for reimbursement to the Medicare and Medicaid programs incident to the provision of hospice services.

3.     This Court has jurisdiction over the subject matter of this action arising under the laws of the United States pursuant to:  (i) 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3729 and 3730; (ii) 28 U.S.C. § 1331, which confers federal subject matter jurisdiction; and, (iii) 28 U.S.C. § 1345, because the United States is a Plaintiff.

4.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a), because that section authorizes nationwide service of process and because Defendants have minimum contacts with the United States.  Moreover, Defendants can be found in, reside, or transact or have transacted business in the District of Nevada.

5.     Jurisdiction over the state law claims alleged herein is proper under 31 U.S.C. § 3732(b).  This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

6.     This action is not based upon prior public disclosures of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit or investigation, or in a Government Accounting Office or Auditor General's report, hearing, audit, or investigation, or from the news media.  To the extent there has been a public disclosure unknown to Tsosie, she is an original source under 31 U.S.C. § 3730(e)(4) and NRS 357.100.  The facts and information set forth herein are based upon Tsosie's personal observation, investigation and documents produced in this case. Tsosie has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the government before filing a *qui tam* action.

## II.    PARTIES

7.     Tsosie is a Registered Nurse and has been a resident of the State of Nevada since 2001.  She was hired by Defendant Creekside in November of 2011 as an administrator.  For approximately nine years prior thereto she was employed as an RN/Patient Care Manager at Odyssey Healthcare.

8.     Defendant Creekside is a foreign limited-liability company authorized to do business, and doing business, in the State of Nevada as a hospice healthcare provider.  Its principal place of business is at 3675 Pecos McLeod in Las Vegas. Creekside is a subsidiary of Defendant SKH.

9.     Defendant SKH is a foreign corporation organized under the laws of the State of Delaware.  Its principal place of business is at 27442 Portola Parkway in Foothill Ranch, California.  SKH owns Defendant Creekside and multiple other hospice subsidiaries located in Arizona, California, Idaho, Montana and New Mexico.

2

## III. THE LEGAL AND REGULATORY ENVIRONMENT

### A. The Federal And Nevada False Claims Acts

10. The Federal False Claims Act ("FCA") has been the Government's primary fraud fighting tool since the Civil War era. It prohibits any person from knowingly making a false or fraudulent claim against the Government for property or money. The FCA is intended to reach all types of fraud, without qualification, that might result in financial loss to the Government. It mandates that any person who:

(A) Knowingly presents or causes to be presented, a false or fraudulent claim for payment or approval;

(B) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

. . . .

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $11,000, [ . . . ] plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

11. The FCA defines "knowingly" as actual knowledge, or deliberate ignorance or reckless disregard of the truth or falsity of the information; a specific intent to defraud is not required. 31 U.S.C. § 3729(b).

12. The Nevada False Claims Act ("NV FCA") was enacted in 1999 and substantially tracks the foregoing provisions of the FCA and imposes a civil penalty of not less than $5,000 or more than $10,000 for each act. NRS 357.040(1).

13. The NV FCA defines "knowingly" in the same manner as the FCA. NRS 357.040(2).

### B. The Medicare And Medicaid Programs

3

14.     Medicare is a federally funded health insurance program primarily for the benefit of those age 65 or older or those with certain physical conditions. Medicare was created in 1965 when Title XVIII of the Social Security Act was adopted.  42 U.S.C. §1395.  The Department of Health and Human Services ("HHS") is responsible for the administration and supervision of the Medicare program.  The Centers for Medicare and Medicaid Services ("CMS") is an agency of HHS that directly administers the Medicare program.

15.     Medicare Part A provides a hospice care benefit which covers the multidisciplinary services addressing the physical and emotional pain associated with terminal illness through palliative treatment.  To be eligible to elect hospice care under Medicare, an individual must be entitled to Part A of Medicare, and be certified as terminally ill (i.e., the individual must be certified as having a life expectancy of six months or less if the terminal illness were to take its normal course).

16.     The Medicare hospice benefit is provided for specified amounts of time known as "election periods."  A physician may certify a patient for hospice care coverage for two initial 90-day election periods followed by an unlimited number of 60-day election periods.  Each election period requires that the physician certify a terminal illness.  Such certification is a condition of payment by Medicare.

17.     When assessing the patient for hospice recertification the clinical findings are to include evidence from the three following categories:  i) decline in clinical status guidelines, i.e., decline in systolic blood pressure to below 90 or progressive postural hypotension; ii) non disease-specific base guidelines, i.e.,

4

decline in functional status as demonstrated by Karnofsky Performance Status or Palliative Performance Score and dependence in two or more activities of daily living; and, iii) co-morbidities.

18. The Patient Protection and Affordable Care Act of 2010 ("PPACA") implemented new requirements for hospice certification. The law requires a hospice physician or nurse practitioner to have a face-to-face ("F2F") encounter with every hospice patient to determine continued eligibility of the patient prior to the 180th-day recertification and prior to each subsequent certification. The law also requires that the hospice physician or nurse practitioner attest that such a visit took place. Final rules promulgated by CMS implementing these requirements at 42 CFR § 418.22(4) were published on November 17, 2010 with an effective date of January 1, 2011. 75 Federal Register 70372; November 17, 2010. The F2F encounter and accompanying attestation is a condition of payment by Medicare.

19. A condition of participation in the Medicare program for hospices also involves the use of volunteer staff. Specifically, "[v]olunteers must provide day-to-day administrative and/or direct patient care services in an amount that, at a minimum, equals 5 percent of the total patient care hours of all paid hospice employees and contract staff." 42 CFR § 418.78.

20. Medicaid is a public assistance program providing for payment of medical expenses primarily for the poor and disabled. 42 U.S.C. § 1396 *et seq.* Funding for Medicaid is shared between the federal government and state governments. For dual-eligible patients (those eligible for both Medicaid and Medicare), Medicaid pays the deductible for Medicare patients.

5

21.     The Nevada Medicaid program is administered by the Nevada Department of Health and Human Services, Division of Health Care Financing and Policy ("DHCFP") with principal offices in Carson City, Nevada. DHCFP utilizes a fiscal agent to administer the Medicaid program which is HP Enterprise Services.

22.     The Nevada Medicaid program mandates hospice care coverage and sets forth the rules and regulations for such coverage and reimbursement in Chapter 3200 of the Medicaid Services Manual. Amongst other things, the Manual requires that hospice services be provided within the limitations of 42 CFR § 418.

## IV.    DEFENDANTS' UNLAWFUL CONDUCT

### A.    Failure to Discharge Non Terminally Ill Patients

23.     The *sine qua non* of hospice eligibility, and Medicare and Medicaid reimbursement, is that a patient be terminally ill.

24.     Patients are to receive initial and comprehensive assessments at or near the time of election of hospice care. The comprehensive assessment must take into consideration, amongst other things, the nature and condition causing admission.     Thereafter, the comprehensive assessment must be updated as frequently as the condition of the patient requires, but no less frequently than every 15 days. Such updates must also reassess the patient's response to care. 42 CFR § 418.54.

25.     Hospices are also required to have in place a discharge planning process that takes into account the prospect that a patient's condition might stabilize or otherwise change such that the patient cannot continue to be certified as terminally ill. 42 CFR § 418.26.

6

26. Nationwide statistics compiled by the National Hospice and Palliative Care Organization ("NHPCO") reflect that in 2010 and 2009 the average number of overall hospice patients in the United States whose length of service ("LOS") of care equaled or exceeded 180 days was 11.8%. NHPCO noted that LOS exceeding 180 days had been trending lower for several years.

27. By contrast the percentage of Defendants' patients receiving hospice care in excess of 180 days is substantially higher. For example, Defendant Creekside's average in 2011 was approximately 41.38% with over 85 living patients having a LOS exceeding 400 days. Other facilities owned by Defendant SKH reveal similar increased LOS percentages: Sun Valley Hospice in Mesa, Arizona averaged approximately 40.63% in 2011; Legacy Hospice in Meridian, Idaho averaged approximately 27.82% in 2011; Rocky Mountain Hospice in Billings, Montana averaged approximately 37.87% in 2011; Rocky Mountain Hospice in Bozeman, Montana averaged approximately 39.22% in 2011; and, Rocky Mountain Hospice in Butte, Montana averaged approximately 44.86% in 2011.

28. Defendants have knowingly failed, and continue to fail, to reassess patient response to care on behalf of their hospice patients, to properly discharge plan on behalf of their hospice patients, and/or to properly clinically evaluate the status of their hospice patients. As a consequence patients who no longer should be considered terminally ill are continued in hospice care and improperly billed to the Medicare and Medicaid programs. One such example involves Medicare beneficiary R    M_____ who was initially admitted to Creekside for hospice care in April of 2009 with a diagnosis of "severe debility with cognitive and functional decline."

7

However, his physical condition actually improved subsequent to admission and has remained essentially chronic as opposed to terminal. Another example involves Medicare beneficiary B██ O____ who was initially admitted to Creekside in July of 2009 post CVA and with a diagnosis of debility although she was able to walk with little assistance. Her history and physical at time of admission were not indicative of a terminal disease and her physical condition for over a year and a half or longer was essentially chronic as opposed to terminal. Yet, for both these patients, as well as many others, Creekside has billed both the Medicare and Medicaid programs for hospice care.

## B.     Failure to Conduct Face-to-Face (F2F) Encounters

29.     During the first week of December, 2011 Tsosie performed patient chart audits at Creekside to determine F2F compliance for patients whose LOS were greater than 180 days. At that time 192 patients of the total census of 372 (52%) were so categorized. The audit sample was 19 patients, or 10% of the group. The audited charts reflected a total of 100 hospice recertifications. However, only 11 F2F notes existed, and of that number only 9 (9%) were valid.

30.     During the second week of December, 2011 Tsosie and Creekside Education Coordinator Diane Cohen, RN performed an expanded audit for this same group to further ascertain F2F compliance. 189 charts were audited. Acceding to Cohen's utilization of questionable documents, this audit determined a compliance factor of 24%.

31.     In the third week of December, 2011 Plaintiff/Relator was removed from any further auditing work. Chief Nursing Officer ("CNO") Katherine Ryan told

8

Tsosie that Defendant SKH "had deep pockets" and that she was not concerned with the audit findings. The following week Tsosie's job description was adjusted and she was placed under the direct supervision of Ryan.

32.     Thereafter, Tsosie discovered that Creekside was engaged in a pattern of conduct to create documentation for patient charts in an attempt to show F2F compliance and legitimize its false billings. For example, many Attestation forms were created and/or signed on December 21, 2011 purporting to confirm F2F encounters as far back in time as May of 2011. In the case of Medicare beneficiary E█████O___ the hospice Nurse Practitioner claimed a F2F encounter on May 10, 2011 after which she gave the clinical findings to the certifying physician for use in determining continued hospice eligibility. The certifying physician's recertification narrative, however, is dated May 5, 2011. Another effort involved the creation of Attestation forms in which the phrase "See progress notes" or "See notes" was inserted without further information. As in the case of Medicare beneficiary A█████ G_____ , and many other patients, there is simply nothing in the patient notes suggesting a F2F encounter. Numerous other examples of these efforts are included in Tsosie's Initial Disclosure Statement and are incorporated herein by reference. This clandestine effort was apparently still in progress as late as March 4, 2012 when Creekside medical records employee Shonda Wilson noted in her document search efforts: "Ask [CNO] Kate [Ryan] about F2F old vs new . . . Are we going back and getting them all that are missing?"

33.     Defendants were acutely aware of the F2F requirements and their effective date of January 1, 2011. The hospice industry was substantially engaged

9

with CMS during the proposed rule-making time frame. Additionally, SKH considered the issue so important that its 2011 First Quarter 10-Q Report to the U. S. Securities and Exchange Commission ("SEC") contained the following reference in the Section entitled "Regulatory and Other Governmental Actions Affecting Revenue":

> **Face-to-face encounter requirements.** PPACA also imposes on home health agencies and hospices new face-to-face encounter requirements with patients. . . . Under Section 3132(b) of PPACA, a hospice physician or nurse practitioner is required to have face-to-face encounter with a hospice patient prior to the patient's 180th-day recertification, and each subsequent recertification. The encounter must occur no more than 30 calendar days prior to the start of the hospice patient's third benefit period. The provision applies to recertifications on and after January 1, 2011.

(emphasis in original).

34. Defendants knowingly failed to comply with the F2F requirements for hospice patient recertification and billing thereby causing false billings to the Medicare and Medicaid programs. One such example involved Medicare beneficiary B B_____ for whom Creekside billed Medicare each month of 2011 for hospice care. However, from at least March until the end of December there are no F2F encounters in her chart. Another example involved Medicare beneficiary I B_____ for whom Creekside billed Medicare each month of 2011 for hospice care. However, from January until the end of October there are no F2F encounters in her chart. And, with respect to both of these Medicare patients and others, Creekside billed the Medicaid program for hospice care for several months of the year as well. Another example involved Medicaid recipient C S_____ for whom Creekside billed Medicaid each month of 2011 for hospice care. However, from at least February

10

through the end of November there are no F2F encounters in her chart. Numerous

other examples are included in Tsosie's Initial Disclosure Statement and are

incorporated herein by reference.

## C.     Failure to Meet Volunteer Work Force Threshold

35.     A material condition of participation in the Medicare program, and a

material condition of payment by Medicare and Medicaid, is that hospice providers

utilize volunteer workers that, at a minimum, equal 5 percent of paid and contract

staff.

36.     The Medicare Enrollment Application for providers such as Creekside

requires the following certification:

> I agree to abide by the Medicare laws, regulations and program
> instructions that apply to this provider. The Medicare laws,
> regulations, and program instructions are available through the
> Medicare contractor. I understand that payment of a claim by
> Medicare is conditioned upon the claim and underlying transaction
> complying with such laws, regulations, and program instructions
> (including, but not limited to, the Federal anti-kickback statute and
> the Stark law), *and on the provider's compliance with all applicable
> conditions of participation in Medicare.*

(emphasis added).

37.     The Provider Enrollment Application for Nevada Medicaid requires

the following declaration from providers:

> I understand that I am responsible for the presentation of true,
> accurate and complete information on all invoices/claims
> submitted to HP Enterprise Services. I further understand that
> payment and satisfaction of these claims will be from Federal
> and State funds *and that false claims, statements, documents or
> concealment of material facts may be prosecuted under applicable
> Federal and State laws.*

11

Case 2:13-cv-00632-APG-PAL Document 15-01 Filed 02/12/16 Page 20 of 45

(emphasis added).    Medicaid providers must further agree to "comply with protocols set forth in the Nevada Medicaid Services Manual, including but not limited to, . . . submitting accurate, complete and timely claims, . . ."

38.    Throughout 2011, and years prior thereto, Creekside and several other SKH hospice facilities failed to meet this requirement.    During 2011 Creekside's percentage of volunteer workers compared to paid employees was as follows:

January – 1.67%; February – 3.17%; March – 3.15%; April – 3.40%; May – 3.28%;

June – 4.03%; July – 3.74%; August – 4.03%; September – 4.19%; October – 5.25%;

November – 5.31%; December – 4.68%.

39.    Defendants knowingly failed to comply with the volunteer worker requirements. As a result they have caused, and continue to cause, false billings to the Medicare and Medicaid programs.

## COUNT I

### Federal False Claims Act, 31 U.S.C. §§ 3729 (a)(1)(A), (a)(1)(B)

40.    Tsosie repeats and realleges each and every allegation contained in paragraphs 1 through 39 above as though fully set forth herein.

41.    This is a claim for treble damages and penalties under the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*

42.    By virtue of the acts described above, Defendants knowingly caused to be presented false or fraudulent claims to officers, employees or agents of the

12

United States Government for payment or approval within the meaning of 31 U.S.C. § 3729(a)(1)(A).

43.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false or fraudulent records and statements, and omitted material facts, to get false and fraudulent claims paid or approved, and/or that were material to a false claim, within the meaning of 31 U.S.C. § 3729(a)(1)(B).

44.     The United States, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, paid claims that would not have been paid but for Defendants' unlawful conduct.

45.     By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

46.     Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants arising from their unlawful conduct as described herein.

## COUNT II

### Nevada False Claims Act, NRS 357.010 *et seq.*

47.     Tsosie repeats and realleges each and every allegation contained in paragraphs 1 through 39 above as though fully set forth herein.

48.     This is a claim for treble damages and penalties under the Nevada False Claims Act, NRS 357.010 *et seq.*

13

49.    By virtue of the acts described above, Defendants knowingly caused to be presented false or fraudulent claims to officers, employees or agents of the State of Nevada for payment or approval within the meaning of NRS 357.040(1)(a).

50.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false or fraudulent records and statements, and omitted material facts, to get false and fraudulent claims paid or approved, and/or that were material to a false claim, within the meaning of NRS 357.040(1)(b).

51.    The State of Nevada, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, paid claims that would not have been paid but for Defendants' unlawful conduct.

52.    By reason of the Defendants' acts, the State of Nevada has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

53.    Additionally, the State of Nevada is entitled to the maximum penalty of $10,000 for each and every false and fraudulent claim caused to be made by Defendants arising from their unlawful conduct as described herein.

## PRAYER

WHEREFORE, Tsosie prays for judgment against Defendants as follows:

1.    That Defendants cease and desist from violating 31 U.S.C. § 3729 *et seq.* and NRS 357.010 *et seq.;*

2.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because

14

of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $11,000 for each violation of 31 U.S.C. § 3729 *et seq.*;

3. That Tsosie be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

4. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Nevada sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $10,000 for each violation of NRS 357.010 et seq.;

5. That Tsosie be awarded the maximum amount allowed pursuant to NRS 357.210;

6. That Tsosie be awarded all cost of this action, including attorney's fees and expenses pursuant to 31 U.S.C. §3730(d) and NRS 357.180;

7. For such other and further relief as the Court deems just and proper.

/ / /

/ / /

/ / /

15

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Tsosie hereby

demands a jury trial.


Dated this 9th day of April, 2012.


THE TERRY LAW FIRM, LTD.


By:  L. Timothy Terry (NV Bar # 2341)
tim@theterrylawfirm.com
The Terry Law Firm, Ltd.
P. O. Box 2348
Carson City, NV  89702
775.883.2348 (Ph)
775.883.2347 (Fax)

# EXHIBIT B

L. Timothy Terry (NV Bar #2341)
tim@theterrylawfirm.com
The Terry Law Firm, Ltd.
P. O. Box 2348
Carson City, NV 89702
775.883.2348 (Ph)
775.883.2347 (Fax)

Attorney for Plaintiff/Relator
Joanne Cretney-Tsosie



FILED
ENTERED
COUNSEL/PARTIES OF RECORD

July 2 2012

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: _____ DEPUTY

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA ) <br> *ex rel.* JOANNE CRETNEY-TSOSIE; ) <br> and STATE OF NEVADA *ex rel.* ) <br> JOANNE CRETNEY-TSOSIE; and ) <br> JOANNE CRETNEY-TSOSIE, ) <br> individually, ) <br> ) <br> ) <br> Plaintiffs, ) <br> ) <br> vs. ) <br> ) <br> CREEKSIDE HOSPICE II, LLC, and ) <br> SKILLED HEALTHCARE GROUP, ) <br> INC., ) <br> ) <br> Defendants. ) <br> ) <br> ) <br> ) <br> _____ ) | Case No. 3:12-cv-00190 <br><br> **FILED IN CAMERA AND UNDER SEAL** <br><br> **DO NOT ENTER IN CM/ECF** <br><br> FIRST AMENDED COMPLAINT <br> FOR VIOLATION OF THE <br> UNITED STATES FALSE CLAIMS ACT, <br> 31 U.S.C. § 3729, *et seq*; and the NEVADA <br> FALSE CLAIMS ACT, NRS 357.010 *et seq* <br><br> **JURY TRIAL DEMANDED** |

## I.    JURISDICTION AND VENUE

1.    Plaintiff/Relator Joanne Cretney-Tsosie ("Tsosie") brings this action on behalf of the United States of America under the federal False Claims Act, 31 U.S.C. § 3729 *et seq*, on behalf of the State of Nevada under the Nevada False Claims Act, NRS 357.010 *et seq*, and on her own behalf, against Creekside Hospice II, LLC ("Creekside") and Skilled Healthcare Group, Inc. ("SKH").

2.    This action involves Defendants' submission of false claims for reimbursement to Medicare, Medicaid and other federal and/or state funded health care programs incident to the provision of hospice services.

3.    This Court has jurisdiction over the subject matter of this action arising under the laws of the United States pursuant to: (i) 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3729 and 3730; (ii) 28 U.S.C. § 1331, which confers federal subject matter jurisdiction; and, (iii) 28 U.S.C. § 1345, because the United States is a Plaintiff.

4.    This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a), because that section authorizes nationwide service of process and because Defendants have minimum contacts with the United States. Moreover, Defendants can be found in, reside, or transact or have transacted business in the District of Nevada.

5.    Jurisdiction over the state law claims alleged herein is proper under 31 U.S.C. § 3732(b). This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

6.     This action is not based upon prior public disclosures of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit or investigation, or in a Government Accounting Office or Auditor General's report, hearing, audit, or investigation, or from the news media. To the extent there has been a public disclosure unknown to Tsosie, she is an original source under 31 U.S.C. § 3730(e)(4) and NRS 357.100. The facts and information set forth herein are based upon Tsosie's personal observation, investigation and documents produced in this case. Tsosie has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the government before filing a *qui tam* action.

**II.     PARTIES**

7.     Tsosie is a Registered Nurse and has been a resident of the State of Nevada since 2001. She was employed by Defendant Creekside from November of 2011 until May of 2012 as an administrator. For approximately nine years prior thereto she was employed as an RN/Patient Care Manager at Odyssey Healthcare.

8.     Defendant Creekside is a foreign limited-liability company authorized to do business, and doing business, in the State of Nevada as a hospice healthcare provider. Its principal place of business is at 3675 Pecos McLeod in Las Vegas. Creekside is a subsidiary of Defendant SKH.

9.     Defendant SKH is a foreign corporation organized under the laws of the State of Delaware. Its principal place of business is at 27442 Portola Parkway in Foothill Ranch, California. SKH owns Defendant Creekside and multiple other hospice subsidiaries located in Arizona, California, Idaho, Montana and New Mexico

2

amongst which are: Sun Valley Hospice in Mesa, Arizona; Cornerstone Hospice in Phoenix, Arizona; Cornerstone Hospice in Colton, California; Legacy Hospice in Meridian, Idaho; Rocky Mountain Hospice in Billings, Montana; Rocky Mountain Hospice in Bozeman, Montana; and Rocky Mountain Hospice in Butte, Montana.

## III.    THE LEGAL AND REGULATORY ENVIRONMENT

### A.    The Federal And Nevada False Claims Acts

10.    The Federal False Claims Act ("FCA") has been the Government's primary fraud fighting tool since the Civil War era. It prohibits any person from knowingly making a false or fraudulent claim against the Government for property or money. The FCA is intended to reach all types of fraud, without qualification, that might result in financial loss to the Government. It mandates that any person who:

(A) Knowingly presents or causes to be presented, a false or fraudulent claim for payment or approval;

(B) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

. . . .

(G) . . . [k]nowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $11,000, [ . . . ] plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

11.    The FCA defines "knowingly" as actual knowledge, or deliberate ignorance or reckless disregard of the truth or falsity of the information; a specific intent to defraud is not required.  31 U.S.C. § 3729(b).

3

12. The Nevada False Claims Act ("NV FCA") was enacted in 1999 and substantially tracks the foregoing provisions of the FCA and imposes a civil penalty of not less than $5,000 or more than $10,000 for each act. NRS 357.040(1).

13. The NV FCA defines "knowingly" in the same manner as the FCA. NRS 357.040(2).

## B. Medicare, Medicaid And Other Government Funded Programs

14. Medicare is a federally funded health insurance program primarily for the benefit of those age 65 or older or those with certain physical conditions. Medicare was created in 1965 when Title XVIII of the Social Security Act was adopted. 42 U.S.C. §1395. The Department of Health and Human Services ("HHS") is responsible for the administration and supervision of the Medicare program. The Centers for Medicare and Medicaid Services ("CMS") is an agency of HHS that directly administers the Medicare program.

15. Medicare Part A provides a hospice care benefit which covers the multidisciplinary services addressing the physical and emotional pain associated with terminal illness through palliative treatment. To be eligible to elect hospice care under Medicare, an individual must be entitled to Part A of Medicare, and be certified as terminally ill (i.e., the individual must be certified as having a life expectancy of six months or less if the terminal illness were to take its normal course).

16. The Medicare hospice benefit is provided for specified amounts of time known as "election periods." A physician may certify a patient for hospice care coverage for two initial 90-day election periods followed by an unlimited number of

4

60-day election periods. Each election period requires that the physician certify a terminal illness. Such certification is a condition of payment by Medicare.

17.     When assessing the patient for hospice recertification the clinical findings are to include evidence from the three following categories: i) decline in clinical status guidelines, i.e., decline in systolic blood pressure to below 90 or progressive postural hypotension; ii) non disease-specific base guidelines, i.e., decline in functional status as demonstrated by Karnofsky Performance Status or Palliative Performance Score and dependence in two or more activities of daily living; and, iii) co-morbidities.

18.     Effective January 1, 2011 hospice physicians or nurse practitioners must have a Face-to-Face ("F2F") encounter with every hospice patient to determine continued eligibility of the patient prior to the 180th-day recertification and prior to each subsequent certification. The hospice physician or nurse practitioner must also attest that such a visit took place. 42 CFR § 418.22. The F2F encounter and accompanying attestation is a condition of payment by Medicare.

19.     A condition of participation in the Medicare program for hospices also involves the use of volunteer staff. Specifically, "[v]olunteers must provide day-to-day administrative and/or direct patient care services in an amount that, at a minimum, equals 5 percent of the total patient care hours of all paid hospice employees and contract staff." 42 CFR § 418.78.

20.     Medicaid is a public assistance program providing for payment of medical expenses primarily for the poor and disabled. 42 U.S.C. § 1396 *et seq.* Funding for Medicaid is shared between the federal government and state

governments. For dual-eligible patients (those eligible for both Medicaid and Medicare), Medicaid pays the deductible for Medicare patients.

21. The Nevada Medicaid program is administered by the Nevada Department of Health and Human Services, Division of Health Care Financing and Policy ("DHCFP") with principal offices in Carson City, Nevada. DHCFP utilizes a fiscal agent to administer the Medicaid program which is HP Enterprise Services.

22. The Nevada Medicaid program mandates hospice care coverage and sets forth the rules and regulations for such coverage and reimbursement in Chapter 3200 of the Medicaid Services Manual. Amongst other things, the Manual requires that hospice services be provided within the limitations of 42 CFR § 418.

23. The Veterans Health Administration ("VHA") provides for hospice care similar to the Medicare program. Section 1140.5 of the VHA Handbook sets forth the criteria for hospice care as follows:

### 3. DEFINITIONS

a. VHA Hospice and Palliative Care. VHA Hospice and Palliative Care is care in which the primary goal of treatment is comfort rather than cure in a person with an advanced disease that is life-limiting and refractory to disease-modifying treatment; this includes bereavement care to the veteran's family.

b. VHA Hospice Care. VHA Hospice Care is care provided to a veteran meeting all of the following criteria; the veteran:

(1) Is diagnosed with a life-limiting illness.

(2) Has treatment goals focused on comfort rather than cure.

(3) Has a life expectancy, deemed by a VA physician, to be 6 months or less if the disease runs its normal course. *NOTE: This is consistent with the prognosis component of the Medicare hospice criteria.*

(4) Accepts hospice care.

6

24.     Other Government funded health care programs that are billed for hospice care by Defendants include, but are not necessarily limited to, Clark County (Nevada) Firefighters, Clark County (Nevada) Self Funded, Federal Blue Cross/Blue Shield, State of Nevada Public Employee Benefit Program ("PEBP"), and Tricare. Many, if not all, of these programs provide hospice coverage under terms and conditions similar to Medicare and Medicaid.

## IV.     DEFENDANTS' UNLAWFUL CONDUCT

## A.     Admitting Non-Terminally Ill Patients; Failure to Discharge Non-Terminally Ill Patients

25.     The *sine qua non* of hospice eligibility, and Medicare, Medicaid and VHA reimbursement, is that a patient be terminally ill.

26.     Medicare patients are to receive initial and comprehensive assessments at or near the time of election of hospice care. The comprehensive assessment must take into consideration, amongst other things, the nature and condition causing admission. Thereafter, the comprehensive assessment must be updated as frequently as the condition of the patient requires, but no less frequently than every 15 days. Such updates must also reassess the patient's response to care. 42 CFR § 418.54.

27.     Hospices are also required to have in place a discharge planning process that takes into account the prospect that a patient's condition might stabilize or otherwise change such that the patient cannot continue to be certified as terminally ill. 42 CFR § 418.26.

7

28.     Nationwide statistics compiled by the National Hospice and Palliative Care Organization ("NHPCO") reflect that in 2010 and 2009 the average number of overall hospice patients in the United States whose length of service ("LOS") of care equaled or exceeded 180 days was 11.8%.  NHPCO noted that LOS exceeding 180 days had been trending lower for several years.

29.     By contrast the percentage of Defendants' patients receiving hospice care in excess of 180 days is substantially higher.  For example, Defendant Creekside's average in 2011 was approximately 41.38% with over 85 living patients having a LOS exceeding 400 days. Other facilities owned by Defendant SKH reveal similar increased LOS percentages: Sun Valley Hospice in Mesa, Arizona averaged approximately 40.63% in 2011; Legacy Hospice in Meridian, Idaho averaged approximately 27.82% in 2011; Rocky Mountain Hospice in Billings, Montana averaged approximately 37.87% in 2011; Rocky Mountain Hospice in Bozeman, Montana averaged approximately 39.22% in 2011; and, Rocky Mountain Hospice in Butte, Montana averaged approximately 44.86% in 2011.

30.     Defendants have knowingly admitted non-terminally ill patients for hospice care.  Defendants have also knowingly failed, and continue to fail, to reassess patient response to care on behalf of their hospice patients, to properly discharge plan on behalf of their hospice patients, and/or to properly clinically evaluate the status of their hospice patients.   As a consequence patients who no longer should be considered terminally ill are continued in hospice care and improperly billed to Medicare, Medicaid and other government funded health care programs. Examples of such conduct involve Medicare beneficiaries R

8

M_____ and E__ 0____. R___M___ was initially admitted to Creekside for hospice care in April of 2009 with a diagnosis of "severe debility with cognitive and functional decline." However, his physical condition actually improved subsequent to admission and has remained essentially chronic as opposed to terminal. E█████ 0____ who was initially admitted to Creekside in July of 2009 post CVA and with a diagnosis of debility although she was able to walk with little assistance. Her history and physical at time of admission were not indicative of a terminal disease and her physical condition for over a year and a half or longer was essentially chronic as opposed to terminal. Yet, for both these patients, as well as many others, Creekside has billed both the Medicare and Medicaid programs for hospice care.

31.     Similarly, Defendants have billed the VHA program on behalf of patients whose LOS have far exceeded 1,000 days. Such VHA patients include, but are not limited to, G██ H____, R████ K____, and D█ █M____.

## B.     Failure to Conduct Face-to-Face (F2F) Encounters

32.     During the first week of December, 2011 Tsosie performed patient chart audits at Creekside to determine F2F compliance for patients whose LOS were greater than 180 days. At that time 192 patients of the total census of 372 (52%) were so categorized. The audit sample was 19 patients, or 10% of the group. The audited charts reflected a total of 100 hospice recertifications. However, only 11 F2F notes existed, and of that number only 9 were valid.

33.     During the second week of December, 2011 Tsosie and Creekside Education Coordinator Diane Cohen performed an expanded audit for this same group to further ascertain F2F compliance. 189 charts were audited. Acceding to

9

Cohen's utilization of questionable documents, this audit determined a compliance factor of 24%.

34. In the third week of December, 2011 Plaintiff/Relator was removed from any further auditing work. Chief Nursing Officer ("CNO") Katherine Ryan told Tsosie that Defendant SKH "had deep pockets" and that she was not concerned with the audit findings. The following week Tsosie's job description was adjusted and she was placed under the direct supervision of Ryan.

35. Thereafter, Tsosie discovered that Creekside was engaged in a pattern of conduct to create documentation for patient charts in an attempt to show F2F compliance and legitimize its false billings. For example, many Attestation forms were created and/or signed on December 21, 2011 purporting to confirm F2F encounters as far back in time as May of 2011. In the case of Medicare beneficiary E███ O___ the hospice Nurse Practitioner claimed a F2F encounter on May 10, 2011 after which she gave the clinical findings to the certifying physician for use in determining continued hospice eligibility. The certifying physician's recertification narrative, however, is dated May 5, 2011. Another effort involved the creation of Attestation forms in which the phrase "See progress notes" or "See notes" was inserted without further information. As in the case of Medicare beneficiary A███ G_____ , and many other patients, there is simply nothing in the patient notes suggesting a F2F encounter. Numerous other examples of these efforts are included in Tsosie's Initial Disclosure Statement and are incorporated herein by reference. This clandestine effort was apparently still in progress as late as March 4, 2012 when Creekside medical records employee Shona Wilson noted in her document

10

Case 2:13-cv-00166-RGJ-PJH Document 1-1 Filed 01/28/16 Page 37 of 45

search efforts: "Ask [CNO] Kate [Ryan] about F2F old vs new . . . Are we going back and getting them all that are missing?"

36.     Defendants were acutely aware of the F2F requirements and their effective date of January 1, 2011. The hospice industry was substantially engaged with CMS during the proposed rule-making time frame. Additionally, SKH considered the issue so important that its 2011 First Quarter 10-Q Report to the U. S. Securities and Exchange Commission ("SEC") contained the following reference in the Section entitled "Regulatory and Other Governmental Actions Affecting Revenue":

> **Face-to-face encounter requirements.** PPACA also imposes on home health agencies and hospices new face-to-face encounter requirements with patients. . . . Under Section 3132(b) of PPACA, a hospice physician or nurse practitioner is required to have face-to-face encounter with a hospice patient prior to the patient's 180th-day recertification, and each subsequent recertification. The encounter must occur no more than 30 calendar days prior to the start of the hospice patient's third benefit period. The provision applies to recertifications on and after January 1, 2011.

(emphasis in original).

37.     Defendants knowingly failed to comply with the F2F requirements for hospice patient recertification and billing thereby causing false billings to the Medicare and Medicaid programs. One such example involved Medicare beneficiary B▇▇B_____ for whom Creekside billed Medicare each month of 2011 for hospice care. However, from at least March until the end of December there are no F2F encounters in her chart. Another example involved Medicare beneficiary I▇B_____ for whom Creekside billed Medicare each month of 2011 for hospice care. However, from January until the end of October there are no F2F encounters in her chart. And,

11

with respect to both of these Medicare patients and others, Creekside billed the Medicaid program for hospice care for several months of the year as well. Another example involved Medicaid recipient C████████S_____ for whom Creekside billed Medicaid each month of 2011 for hospice care. However, from at least February through the end of November there are no F2F encounters in her chart. Numerous other examples are included in Tsosie's Initial Disclosure Statement and are incorporated herein by reference.

## C.    Failure to Meet Volunteer Work Force Threshold

38.    A material condition of participation in the Medicare program, and a material condition of payment by Medicare and Medicaid, is that hospice providers utilize volunteer workers that, at a minimum, equal 5 percent of paid and contract staff.

39.    The Medicare Enrollment Application for providers such as Creekside requires the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), *and on the provider's compliance with all applicable conditions of participation in Medicare.*

(emphasis added).

40.    The Provider Enrollment Application for Nevada Medicaid requires the following declaration from providers:

> I understand that I am responsible for the presentation of true, accurate and complete information on all invoices/claims

12

> submitted to HP Enterprise Services. I further understand that
> payment and satisfaction of these claims will be from Federal
> and State funds *and that false claims, statements, documents or
> concealment of material facts may be prosecuted under applicable
> Federal and State laws.*

(emphasis added). Medicaid providers must further agree to "comply with protocols set forth in the Nevada Medicaid Services Manual, including but not limited to, . . . submitting accurate, complete and timely claims, . . ."

41. Throughout 2011, and years prior thereto, Creekside and several other SKH hospice facilities failed to meet this requirement. During 2011 Creekside's percentage of volunteer workers compared to paid employees was as follows: January – 1.67%; February – 3.17%; March – 3.15%; April – 3.40%; May – 3.28%; June – 4.03%; July – 3.74%; August – 4.03%; September – 4.19%; October – 5.25%; November – 5.31%; December – 4.68%.

42. Defendants knowingly failed to comply with the volunteer worker requirements and falsely certified that they had complied. As a result they have caused, and continue to cause, false billings to the Medicare and Medicaid programs.

## D. Up Coding of Physician Services

43. In addition to basic hospice services, Medicare also reimburses for some "Physician Services" rendered in the hospice setting. Claims are submitted referencing established billing codes such as the American Medical Association's "Current Procedural Terminology" ("CPT").

44. "Up Coding" refers to the improper practice of billing for services using a code (CPT number) that generates a higher reimbursement than one is entitled to.

13

45. From February 1, 2010 through March 29, 2012 Defendant Creekside billed the Medicare program for Physician Services rendered to both "New Patients" and "Established Patients" using CPT codes established for such services. With respect to billings for services rendered to new patients Creekside utilized CPT code 99327 approximately 87 per cent of the time. CPT 99327 offers the second highest reimbursement level of the codes used for new patients. With respect to billings for services rendered to established patients Creekside utilized CPT code 99336 approximately 79 per cent of the time. CPT 99336 offers the second highest reimbursement level of the codes used for established patients. The medical records of Medicare patients such as L_____ C____ indicate that the necessary criteria for utilizing CPT 99327 were not met. The medical records of Medicare patients such as T_____ A____ and E_ C____ indicate that the necessary criteria for utilizing CPT 99336 were not met.

**E. Unallowable Billings**

46. Medicare and Medicaid require Providers to maintain appropriate medical records that reflect the nature and extent of the services rendered for which they are billing. Unsubstantiated billings, or billings for services not rendered, are not allowed.

47. Defendant Creekside maintains a database of unverified services for which they have billed. At least one report of such unverified services covers the period of April 1, 2011 through March 14, 2012 and contains approximately 60 pages of such unverified services. To the extent these unverified services pertain to

14

Case 2:23-cv-00366-ART-EJAY Document 15-1 Filed 07/12/26 Page 41 of 45

services rendered to hospice patients they render corresponding claims to Medicare or Medicaid for the involved patients false.

48.    Time records between March 1, 2011 and December 31, 2011, for Dr. Upinder Singh, a Medical Director at Defendant Creekside, suggest billings for services that are not possible. The records reflect that on the following dates Dr. Singh saw the indicated number of patients: March 22 – 74; March 31 – 97;

April 26 – 99; May 31 – 81; July 6 – 88; August 11 – 59; September 15 – 88; December 6 – 115.

49. Spending a minimum of 15 minutes per patient in an 8-hour day would only equate to seeing 32 patients. Claims for physician services far exceeding the number of hours in a regular work day are false claims.

## F.    Failure to Return Overpayments In A Timely Manner

50.    Medicare and Medicaid providers who receive overpayments have certain obligations related thereto. Specifically, overpayments must be reported and returned within 60 days after the date on which the overpayment was identified, or the date any corresponding cost report is due, if applicable.

51.    Defendants' conduct in admitting non-terminally ill patients, failing to discharge non-terminally ill patients, failing to conduct F2F encounters, failing to meet volunteer work force requirements, up coding physician services, and submitting unallowable billings resulted in overpayments by Medicare and/or Medicaid. Defendants knowingly failed to return such overpayments as required.

15

Case 2:13-cv-00655-RJC-PAL Document 1501 Filed 01/12/16 Page 42 of 45

## COUNT I

### Federal False Claims Act, 31 U.S.C. §§ 3729 (a)(1)(A), (a)(1)(B), (a)(1)(G)

52. Tsosie repeats and realleges each and every allegation contained in paragraphs 1 through 51 above as though fully set forth herein.

53. This is a claim for treble damages and penalties under the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*

54. By virtue of the acts described above, Defendants knowingly caused to be presented false or fraudulent claims to officers, employees or agents of the United States Government for payment or approval within the meaning of 31 U.S.C. § 3729(a)(1)(A).

55. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false or fraudulent records and statements, and omitted material facts, to get false and fraudulent claims paid or approved, and/or that were material to a false claim, within the meaning of 31 U.S.C. § 3729(a)(1)(B).

56. By virtue of the acts described above, Defendants knowingly concealed and/or knowingly avoided an obligation to pay or transmit money to the Government within the meaning of 31 U.S.C. § 3729(a)(1)(G).

57. The United States, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, paid claims that would not have been paid but for Defendants' unlawful conduct.

58. By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

16

59. Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants arising from their unlawful conduct as described herein.

## COUNT II

### Nevada False Claims Act, NRS 357.010 *et seq.*

60. Tsosie repeats and realleges each and every allegation contained in paragraphs 1 through 51 above as though fully set forth herein.

61. This is a claim for treble damages and penalties under the Nevada False Claims Act, NRS 357.010 *et seq.*

62. By virtue of the acts described above, Defendants knowingly caused to be presented false or fraudulent claims to officers, employees or agents of the State of Nevada for payment or approval within the meaning of NRS 357.040(1)(a).

63. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false or fraudulent records and statements, and omitted material facts, to get false and fraudulent claims paid or approved, and/or that were material to a false claim, within the meaning of NRS 357.040(1)(b).

64. The State of Nevada, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, paid claims that would not have been paid but for Defendants' unlawful conduct.

65. By reason of the Defendants' acts, the State of Nevada has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

66.     Additionally, the State of Nevada is entitled to the maximum penalty of $10,000 for each and every false and fraudulent claim caused to be made by Defendants arising from their unlawful conduct as described herein.

## PRAYER

WHEREFORE, Tsosie prays for judgment against Defendants as follows:

1.     That Defendants cease and desist from violating 31 U.S.C. § 3729 *et seq.* and NRS 357.010 *et seq.;*

2.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $11,000 for each violation of 31 U.S.C. § 3729 *et seq.;*

3.     That Tsosie be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

4.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Nevada sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $10,000 for each violation of NRS 357.010 et seq.;

5.     That Tsosie be awarded the maximum amount allowed pursuant to NRS 357.210;

6.     That Tsosie be awarded all cost of this action, including attorney's fees and expenses pursuant to 31 U.S.C. §3730(d) and NRS 357.180;

7.     For such other and further relief as the Court deems just and proper.

18

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Tsosie hereby

demands a jury trial.

Dated this $\underline{12^{th}}$ day of July, 2012.

THE TERRY LAW FIRM, LTD.

By: L. Timothy Terry (NV Bar # 2341)
tim@theterrylawfirm.com
The Terry Law Firm, Ltd.
P. O. Box 2348
Carson City, NV 89702
775.883.2348 (Ph)
775.883.2347 (Fax)